Sorry, 1st District, 1st and 5th Divisions, now in session, is the Honorable Justice Mary L. Hickler, Mr. Biden. Good afternoon, everybody. Please be seated. Was it correct? Please call the queue. 1-23-1359 Melissa Andrews v. Carbon on 26th, LLC Welcome to you all. Thank you to you all for accommodating the Riding the Circuit program that we are, and that you are all part of. Before we start, let me just say a couple of things. First of all, each side will have 20 minutes per argument, and the appellants will have 5 additional minutes for rebuttal. So you do not need to reserve rebuttal. Second, before you start, I'm going to ask you each who's going to be arguing for each side to stand up, tell us your names, and who you represent. And finally, I'm going to invite you to be more fulsome than you might ordinarily be with the facts, because although we've read the briefs, of course, much of the audience has not, and they want to be able to understand what you're saying, and if you need additional time, we're not going to deprive you. So, beginning with the appellant, would you please let us know who's arguing in your name? Yes, good morning, Your Honor. My name is Daniel Arnett with the Arnett Law Group, and I will be arguing on behalf of the appellant, Martin Produce. Good morning. I'm Carol Easey from Whitsfield Cow Law. I'll be arguing in the split-minute time with the other appellant. Thank you. Good morning, Your Honor. Tom Walsh from Lewis-Brisbois-Desjardins-Smith on behalf of the appellant, Lagalera Produce. Okay. And I assume you two have divided it thematically as well, I mean, because your arguments are essentially the same, but you're going to be addressing certain different things. And I ask you to sort of keep track somewhat yourself of when it's time to share. All right. With all that said, can we begin with the appellant? Thank you, Your Honor. Good morning. May it please the Court, Your Honors, Counsel, esteemed guests, my name is Daniel Arnett, again with Arnett Law Group, and I, along with my colleague, Mark Bennett, represent Appellant Martin Produce, Incorporated. The appellant, Martin Produce, is asking this appellate court to review or otherwise overturn the lower court's order of May 16, 2023, which effectively granted summary judgment for the vendors, athletes, Jack Tuckton, and Lagalera, effectively dismissing these necessary parties from a case going to trial shortly before trial. Specifically, on May 16, 2023, summary judgment was granted as the lower court found that Martin Produce had failed to give notice of its breach of warranty claim as required by Section 2-607-3A of the UCC. Just some background for everyone. Actually, what I heard is on March 20, 2023, the judge ruled on summary judgment motions by the parties. Let me interrupt you for just a second. Sure. I just want to make sure there's no jurisdictional issue, because I thought then the rest of the case was... There was no 304-A finding. There was no 304-A finding, because the case was voluntarily dismissed, thereby making all orders finally appealable at that time. Okay. So there's not some trial that's... Nope. Okay. Hopefully not ever, but... Nobody raised jurisdiction... Nope. Okay. So, again, just for everyone listening, on March 20, 2023, motion for summary judgment was granted, and it involved special invitations and a certain disclaimer language, things of that nature. Within that motion was the vendor's motion. So Martin Produce is a distributor of perishable goods, specifically produce, and Jack Tuckton and Locke and Lara are wholesale distributors of produce and other goods. In this instance, the entire case involves something called cilantro. Something called cilantro. You didn't know what cilantro was and if it tastes like soap, but... I've heard that. But specifically, it involves cilantro. Okay. So on March 20, motion for summary judgment, we argued extensively the idea that, under the breach of warranty claim 26073A of the Uniform Commercial Code, requires that the buyer must give direct notice to the seller, and they argued that that did not occur, and the lower court said, we agree, or it doesn't apply. That's in the March 20th order. Then the athletes filed a motion to reconsider, and in that, the judge shockingly overturned his previous opinion and ordered and found that direct notice was required and that our cause of action was barred. And so that's why we're here today, because we believe, Martin Curtis believes, that for three reasons, the notice provision of the UCC 26073A should not have applied. And I do want to point out that this 607 specifically applies to situations where the product was already accepted. All right? So generally, in product situations, you get a product, you look at it. Well, I'll tell you, so how it works with cilantro is that cilantro comes in, comes in on a pallet. So Martin Curtis bought from them a huge pallet of cilantro, multiple pallets throughout several week period, and each pallet are crates of cilantro, and within those crates are bundles of cilantro. All right? And then when Martin, so that's how we buy it from the vendors, and Martin Curtis sells it to restaurants, such as Carbone, involved in this case, and they bought, like, two crates each time, let's say. And then there's issues of how they get from point A to point B, but that's basically how it happened. And in this case, so everyone understands that at this restaurant, Carbone, there was an outbreak of food poisoning involving E. coli, which is a bacteria, and there were ultimately 54 lawsuits filed and 74 individuals that were injured, and the restaurant shut down for over a month, withdrew from the state of Chicago, and other repercussions for which we have that address. All right? So if- We actually have paid a fair amount of money already. Well, that's an interesting question. Well, it's a statement that I should address briefly, which it depends on who is paying whom. I will say this, that my family lost it. All of the personal injury claims, of which there were many, were settled, and payments have been made. And so this is kind of interesting, I suppose. We were all involved in this the whole time, and we actually, with the restaurant, the restaurant's attorneys went to trial, or got started trial, and the idea was to find out who was at fault. So it was a fault allocation thing between the restaurant, Martin's Produce, and the vendors. And then we settled. So we actually picked a jury, did motions, and as settlements are, everyone agreed to something they didn't want to, and everyone compromised. So then it took almost another year, I think, to get all the payments negotiated. But, yeah, so this has been rather complex, and it's been going on for quite some time. Okay? For today's purposes, though, we are arguing that the court erred in its motion to reconsider. So we're asking that the court review and overturn the May 16th order, which we do not believe was consistent with the case law, consistent with the facts of the case, or consistent with its initial ruling of March 20th. And we have three particular reasons that we believe would support your finding that 260738 is not applied. The first is purpose. And it's our position, because 260738 has a very specific and intended purpose, that it would not have applied because the lower courts are allowed to take into consideration the facts and circumstances of each particular case. And in this instance, it should not apply. If the court finds that 260738 would apply to perishable goods involving E. coli, foodborne illnesses, then we are also of the opinion that the two exceptions in Connick v. Suzuki clearly indicate that notice was fulfilled and met, and therefore, again, the March 16th, 2023 order should be overturned. Are you abandoning your argument that they forfeited their right to assert notice? I would say yes. I would say with only 20 minutes, yes. You're not going to focus on that? I'm not focusing on the abandonment. I wish they would have raised it a long time ago, but at this point... You only brought this claim in 2022, correct? We brought our... well, it depends. Okay. That's another... All right, we're not going to talk about this because you only have 20 minutes. I know, I know. Okay. All right. So... That was two years ago. Okay. Just saying. So, all right, so purpose. This is important. I had to figure out the best way to go through this. Let me stop you for a minute because as I read your brief, you were calling for an exception to the notice requirement along the lines, I'm not quite sure, but along the lines of the New York exception. But now you're saying that the courts are supposed to do an individualized determination of whether the purpose of the notice requirement is met under the facts of the case. Oh, yeah. Definitely. Absolutely. So it's a case by case. Yeah. And I'll leave it to the judges. Definitely. They should have a lot of faith in us. Oh, I do. Absolutely. But there's two points. So, one, we were asking for an exception. We are going to ask that you either create an exception, if I don't run out of time, and or expound upon the finding in comic. But, yes, absolutely, it's a case by case basis. And that is exactly what's the point. And the point here is the UCC's notice requirement has a very well-defined purpose. It specifically is to advise a product seller of a defect before engaging in legal action. It is to encourage negotiations and settlement by allowing the parties to investigate the breach, cure the defects, and mitigate damages. We cited the Maldonado Conduct and Mule Power in our briefs. Why does settlement, investigation, curing, and mitigating damages not apply? Because they could not. They literally could not. I wanted to point to Wagmonster, Your Honor. That's the one where it says an evaluation of whether the notice requirement has been satisfied. It's based on factual setting of each case and the circumstances of the parties involved. So I want to direct your attention to that particular case. That does not mean to me that we determine on a case-to-case basis whether there's a need for notice, whether notice is reasonable. All of those things are very factual and very specific. Right. Is this just? Well, just to expound on that, if I may, just let's look at the second exception of comic, which is actual knowledge. You have to look at the facts. For sure. Right. So in this situation, if the purpose is to settle, investigate, cure, or mitigate, then they have to figure out what happened. Like they're not, the court can't say, did you get notice? No. And it's not a bright-line rule. It's not a specific hard-nosed rule that if you don't, you're out. That's what they're arguing. That's not how it works. It's not just, and it's not right. Because the idea behind notice is that the specific buyer is apprised of the troublesome nature of the specific transaction, specific product. In this instance, and this was extremely well-known in the litigation, in all our briefs, in all motions for summary judgment, the non-conformity, that's the language they use in 260738, the non-conformity, the breach, is latent. It is invisible. E. coli cannot be seen, smelled, touched, tasted, nothing. The only way that anyone would know that there was a problem with this particular produce is if someone ate it. That alone takes it out of the box. That takes it out of the notice requirement in our particular opinion. Why? Because by the time they're eating it, there's no chance to cure it. The harm's already done. So the exception you're asking for is basically latent defect. I think that would be excellent. Either a latent defect or, actually, we were kicking that around. That's a little bit tough if you apply it, because some would argue that everything's a latent defect until it's discovered. So while I like the idea of arguing that latent defects shouldn't fall under the notice provision, I don't think that necessarily is consistent with the point of the UCC and notice. But I do think perishable goods, I think perishable goods should fall under that exception. Because, frankly, by the time you figure out, because, so basically, when they're looking at the cilantro, they look at it and they go, is it green? Yes, it's green. Is it smell moldy? No. And they accept it. And the way the UCC works is if there's a problem with the cilantro they accepted, in two days it turns brown. The UCC requires that you call up, call up Martin Produce and Carbone says, you know, your cilantro is brown already. And then Martin Produce goes, okay, we'll send you more cilantro. That makes sense. If this was a $25 issue over two crates of cilantro, that would be one thing. But it's not. It's much, much, much more severe than that. The purpose of the UCC notice cannot be met. And at the same time, justice would dictate that anyone that was involved in the transactions involving the cilantro should be called to the carpet, so to speak. Now, for everyone listening, I want to make it clear. The vendors and Martin Produce, for the record, are denying that there was anything wrong with the cilantro. And this is very, another very important point. We're actually unified in that regard. But the cilantro was tested, like, two days after Carbone shut down, all the cilantro was fine at Martin Produce. Martin Produce reached out and the Department of Health reached out to Martin Produce's customers who received the exact same crates of cilantro from the same pallet. They were all fine. There's literally no evidence connecting. I think that ship has sailed. Which one? The one of whether you guys have any liability collectively for the bad cilantro. That's safe. It's not how are we going to share the blame. Well, it's interesting. I wish it was true. But it's not. Because... I mean, I understand that it complicates your giving notice since you don't think there's anything wrong with the cilantro. I get that part. Actually, it's worse. It's much worse. Because the restaurant isn't suing Martin Produce for 50 bucks of cilantro. We're suing for over $9 million in damages. So the ship has definitely not sailed when it comes down to the risk that this family business is in right now based on a sale. And we're saying if you're going to get us for a dime, you've got to go after where the cilantro came from. So I didn't put my thumbs up. No, I understand what you're saying. But what's before us right now is assume the cilantro is bad. We're assuming. We're starting with the assumption that it's not something that happened at the restaurant. It's something that happened between you and me. That's our assumption. Right. And, yes, for purposes of this exercise, if there's a possible breach, if there's trouble with the transaction, yes, under 60738, there has to be notice given. Again, we would argue that notice does not have to be given. Okay. So let's go back to that argument that because it's perishable, no notice has to be given. That's not. I do not believe that you cited any case that actually adopted that exception. The New York case is birth control pills, which I believe are not perishable, at least not for a long time. So where do we get this exception from, and what gives us the right to carve it out? Well, I'm hoping we're going to get it from you. Okay. Because this is absolutely a case of first impression. 60738 is very old, very antiquated. Even con exceptions are several decades old, 96, I think. And it just doesn't apply. So counsel pointed out very accurately that there were no cases to cite, too. That's true. No comments to mention, also true. That's a situation of first impression. We're asking you to basically expand on comic and or, yes, make an exception today that if there are products that cannot be cured, mitigated, investigated, or resolved, that that part of the UCC shouldn't apply. That's a big ask, but I figured this was my little chance to do it. Okay. So initially, and then we've talked about this, you brought the contingent contribution claim. Yes. The initial claim. Correct. That's the claim that got filed? That, well, sort of. Okay. In the sense that, so there's all the personal injury cases, and can I explain this real quick to everybody? Yes. Okay. Thank you. All right. So everyone, restaurants in late June, people were eating at Carbone. Evidence of illness occurs, and as reported by Chicago Department of Public Health, as soon as the hospital started receiving complaints of food poisoning, they do testing, they find out it's E. coli, and ultimately it got back to Carbone. Carbone was visited by the CDPH, and they basically said, uh-oh, and they shut down. Okay. Now, at that point, no one knows what's going on. They cleaned it all out and everything, and then they shut down for a month or so. Now, you know, well, I would tell everyone that people are hiring attorneys, people are trying to find out what's going on. At the same time, Dr. Stephanie Black, she's the chief investigator, basically. She researched, and she did an epidemiological study because there was no direct evidence of E. coli. Okay, so I forgot to mention that. They tested the cilantro at the restaurant. It was negative for E. coli. Then they tested all the humans that were touching it at the restaurant. They were positive for E. coli. Some of them were. Some of them weren't. And then they started looking at all the products, all the cilantro and the tomatoes, and they figured out, by way of the study, that it was more likely true than not, in Dr. Black's opinion, that it was the cilantro that conveyed, that was the vehicle that transferred it to the consumers. Okay. This is why personal injury complaints are so absolutely critical. At that point, the attorneys started reaching out to the restaurant. The restaurant started saying, wait a minute, it's the cilantro. Hey, who did we buy the cilantro from? Well, it's Martin Produce. And they started calling. And then they called me. And we started looking into it. And this was 2017, I think, something like that. And we're like, huh. And we found out Martin Produce, in the month of June, had purchased cilantro from five different vendors. And we reached out to them. We sent subpoenas, because they weren't in the case. We sent subpoenas. I'm losing time here, so I'm just going to jump to the point. Carbone brings in Martin into the lawsuit. Then Carbone brings in Jack Tuckton in the lawsuit. Then at some point, there's counterclaims, and then Carbone brings in La Galera. In June of 2018, Melissa Andrews, the lead complainant, the original complainant under which this all falls, filed her third amendment complaint and directly sued La Galera, Jack Tuckton, Martin Produce, and Carbone. And everything is in there. Now, why is this important? Can I touch this on? Is it the fact that even though this is not happening for six years later, all that happened six years prior, you're saying placed La Galera and Tuckton on notice of what was happening? Absolutely. And that's the exception that you're seeking? Right. Yes. That's the second exception or the third exception, not the first exception. Right. The first exception, what I'm calling exceptions, purpose doesn't apply, nor should not apply. Then in the scenario that I've just shared with you, because of the 54 different personal injury complaints and everything that went into that, the purpose of notice was met. And the second exception of CONIC, which is the Consumer Files of Personal Injury Complaint, was met. And actual notice was met. Well, knowledge. I think it's important to talk about knowledge versus notice, because this was not anything you gave them. Somebody else gave them information that gave them knowledge, not from you, but from knowledge, that there's a problem with the problem. And I think arguably that would be your argument that it comes within the knowledge exception of CONIC. Right. I can't believe I just said that. Yes. I practice. I'm not fooling you. Right. It's knowledge. It's not notice. It's knowledge. Because notice, I think, has to come from you. That's right. But under CONIC, the notice exception, no, sorry, the notice requirement is fulfilled if they have actual knowledge. From anywhere. From the job. From anywhere. But it must be of the specific transactions with the specific buyer and the specific seller. That's why transactions don't work. I mean, all these actual knowledge pieces, Crest, Oberlin, Malloway, they don't apply because they're generalized knowledge and there's multiple individuals. The reason, this is so subtle and yet perfect from the Supreme Court, which is in personal injury litigation, fault is critical because of liability, which means that every little bundle is analyzed, every transaction we have, we actually submitted the invoices from the two affilies, that's evidence, but we look at everything that happened way more than you might even consider in a breach of contract case because we're talking a lot of money. Approximate cause. Yeah, approximate cause. You know, there were arguments that, I can say this, we never touch the stuff. Why should we be involved? Then there's, well, how much did you buy from them? And who made what on what days? And how many bundles? And how many this and how many that? And everyone, all the experts, all the plaintiffs, everyone is looking exactly at the transactions that are troubling. So in Arconic, the definition of illness is that they were somehow apprised of the troublesome nature of the transaction from a particular buyer and a particular product. And that's why we absolutely believe that notice was fulfilled under those exceptions. And if we were to go that way, there would be no need to carve this broader exception that you're asking for. That's true. I did have another suggestion, and that was going to be that simply put, in the event that personal injury lawsuits are filed, the notice requirement does not apply. I think that covers everything. I kind of said that, but they didn't. And I think that it covers my perishable suggestion. It covers the case-by-case doesn't apply to this particular case exception, and basically makes it a lot simpler to apply for the award of litigation for the personal injury. And this is the other thing I haven't mentioned. This is very critical. The parties when sued in a personal injury case must allege, of course, to bring in the culpable parties. You can't wait, get hit, and then go after them because they can't defend themselves. The necessary party thing, I guess I don't even know that. I'm just letting everyone know there's this necessary party rule, which is everyone who might possibly be responsible has to be brought in. If they're brought in directly, it's a counterclaim. If they're brought in indirectly, it's a third-party complaint. Within that, you've got to allege all the causes of action. In this case, it's strict liability, negligence, breach of warranty, and it could have been latches. It's all got to be there. So when personal injury complaints are filed, everyone knows everything. It's like the good-bad. The breach of warranty wasn't brought in at the start. We actually brought in breach of warranty from day one. Absolutely in the counterclaim. Counterclaim for contribution. The argument has been, well, it's tort, so it doesn't matter. Yeah, it is. Absolutely. I mean, it doesn't tolerate the exceptions. This is just sort of us talking, but the truth is breach of warranty has been – it has to be. In fact, at this point, Carbone is saying they're owed $9 million. All they have is breach of warranty. That's it. The wholesalers are saying you have not sued them for breach of warranty until your indemnification claim was summary judgment in due date. That's a good claim. You lost it on summary judgment. Thank you so much for that. Actually, they're not saying that. They're saying that either the April 16, 2019 third-party complaint that we filed should be barred because of lack of notice between the beginning and the 19th, or they've argued that, and this makes sense, that the July something, July 1st or 2nd, 2022, third-party complaint that was ultimately dismissed by way of their summary judgment, that should have been barred by way of lack of notice. And the crazy thing is, you know, I'm not sure how this worked exactly, but so we're in litigation for many, many years together, even before April of 2019, and they're claiming not having actual knowledge. So I think it's more of a technicality that they're asking the court to address, but it doesn't really make sense to us. So, no, yes, Your Honor, it's our two third-party complaints, and specifically the one that the May 16, 2023 order ultimately dismissed these two parties from. We'll find out more from them about exactly what the argument is and may ask you about it. That makes sense. You've gone well over 20. Do you have something else you need to say, or are there other questions? Any further questions? Well, thank you very much. Please don't return the May 16. Thank you very much. Thank you for your support and attendance. My name is Nick Carolisi, representing FOMC. Jack Barton from my office is also here at this table. I'd like to start with the Martins Council's statement today that the notice could not be met because it appears visible. They knew in July of 2016, when the Chicago Department of Health came to document their floor, there was a problem. There was an outbreak of a number of illnesses at the restaurant. The restaurant appointed them to Martin's, which has a supplier of cilantro. So Martin very easily could have, in July or August of 2016, provided notice to Jack Tufton, La Gallera, of a problem. How long after that were you brought into the suit by somebody, by anybody? We were brought in, I think it was in 2018. It was much later. And that was as a third-party defendant. Then I think Carbone's personal injury actions brought us in. So the only thing they had to do was send that notice. Send a letter, send a notice to us to notify us of a problem. It never happened. So are you saying, would you be arguing that if you had actual knowledge in 2018 when you were made a third-party defendant, at that point you had actual knowledge of the problems with these shipments of cilantro? I would say no, not under the case law. Forget about the case law. I'm just saying, let's say you had actual knowledge. I would disagree that we had actual knowledge. Because you have to have actual knowledge of a defendant. And we can talk about that in some of the cases, talk about that issue. But we had actual knowledge that someone was complaining of a problem. With your cilantro? Correct. But, well, maybe with our cilantro. But I think that's where the court was trying to apply this, at least initially, this common-sense approach. That you did have, you or Tushkin had actual knowledge. And that's where they were initially going. Correct. I think that's right. And you'd say, I know we're looking at this, so we're not going to necessarily consider this a common-sense approach. But the UCC just doesn't allow for that. That's your position? Correct. But are you saying the delay between 2016 and 2018 is why that actual knowledge doesn't matter? That you should have known in 2016? You should have been put on notice in 2016? We should have been put on notice back then. And that would have allowed us to do some important things. With a perishable good like this, we would have had the opportunity to go to the farm where the specific cilantro lot was grown, and do an investigation, do testing of the soil, testing of the irrigation water, investigation of the farm. None of that stuff was done. And being brought in two years later, it's too late. All that evidence is destroyed. It's gone. So we did not have that opportunity. And that's one of the reasons why you have this requirement of timely notice. We didn't get any notice. I mean, with regard to the actual knowledge. But the question of what time we missed, or the question that you did not receive any notice, you didn't move right in. That we didn't get any notice at all, and that the two exceptions don't apply. And with regard to the actual knowledge issue, I think Connie talks about this. They cite three cases. And those cases, I think, kind of really highlight what actual knowledge means. And it's actual pre-suit knowledge, I would say. But long before this suit for indemnification was filed, not indemnification, for breach of warranty, long before this suit, but before us, you had knowledge of something. You may think it's not enough, and you may think it's not soon enough, but you had knowledge, pre-suit knowledge from the PI suits. Of an allegation. Okay, but that's all it has to be. Well, I mean, if you look at the cases that Connie cites, the three cases, the Oberlin case, I think it was one of them. Crest. Crestwood, I think was the other one. And there's a third case, too. And those were all cases where shortly after the transaction occurred, what happened is the seller was put on notice. They actually were able to come to Crest. They weren't put on notice, but they actually were able to look at the specific subject. Right. Their product. And they could actually visualize the problem. But that wouldn't be applicable to this case because you could not look at the product at that point. Yeah, and that's why actual knowledge doesn't really apply here. What applies here is the notice requirement that they didn't meet. But isn't the issue the nature of the product? Again, this was injected. This was digested, I'm assuming. And the Chicago Department of Public Health had an epidemiologist or someone come out, and she made a determination, her best guesstimate, as to what the cause of it was based on the standards of the probability that it was cilantro. So how would you then investigate the product if the product is no longer there? We may not be able to investigate that specific product, but we could do the investigation and suspension of the product. Going to the farm, tracking, doing the trace back. This is what happens in these foodborne illness outbreaks. You go back and trace back, do the investigation, find out whether, not just epidemiologically, in my opinion as to whether there was a cilantro, but microbiologically, doing testing. Testing the soil, the groundwork, the facilities, to see whether you can find that specific E. coli outbreak strain. We didn't have that opportunity. We were prejudiced because we couldn't do that. Back in 2016, 2018, it's too late. Okay, so did you ever make this argument below that, stick with me, that I say that you had knowledge in 2018 of the specific problem, everything that NODIS should have given you, you had knowledge of. Assume it. Take that as an assumption. Have you ever made the argument below that 2016 to 2018 is too late? That's not, knowledge then is not knowledge in terms of the conic knowledge assumption. I'm sure we did in some fashion. I'm pretty sure we did. Okay. And so when, in your view, does the conic knowledge have to, when do you have to have that knowledge? I mean, in those exceptions, that was pretty much right after. It was, yeah. In those cases, it was shortly after. And I guess I'm not sure of the timing of that. I guess the issue is what constitutes, what types of things constitute actual knowledge. And cases where actual knowledge doesn't exist would be a recall notice. There's some cases for a soccer month after the... Because it's too general. It's too general. But this was specific. This was not too general. You're saying it's too late. But it's not too general. It's pretty specific. These lots of cilantro. I mean, it's a PI case. They're trying, as he said, to get approximate cause. They're trying to trace it back as specifically as possible. Correct. I understand that, yes. But there aren't any cases where the court has said that providing, the filing of a lawsuit or participation in a lawsuit actually constitutes actual knowledge. Well, it's a somewhat unusual situation because there's so much litigation around this. But there happens to have been a lawsuit filed, not their lawsuit against you, but a lawsuit by other parties, a number of them, that put out all this information. I mean, that's not the usual scenario, but it's not. But how did that help us investigate and serve the purpose of the notice provision? You're just saying it's too late to have done that. Well, it's inadequate, I guess. Why is it inadequate other than to let? Why is it inadequate? It's inadequate because we didn't have that opportunity to do what we needed to do. But that's because it's too late. You're saying that. It told you everything. It told you there is a problem with this cilantro, your cilantro. There's a problem. Somebody thinks there's a problem. My cilantro looks like hilarious. Possibly. That fact alone suggests that is there really a defect with my cilantro? Is it a defect with Michael Harris? I mean, the fact that there's multiple suppliers here. But the timing doesn't necessarily. I know if we're talking about perishable goods, I guess the timing has to be almost immediate if we're going to draw that type of line. But if there's an issue with somehow the production, the harvesting, that isn't as timing specific and that can be identified, then the notice comes later. Doesn't that extend that time out for us? Does that make sense?  I guess, yeah. The only thing they had to do was provide us with that notice early on so we could do the investigation, whether it was through a lawsuit or otherwise. I mean, just a letter of notice. And when you look at those cases on actual knowledge, I mean, it's pretty clear that you actually are visiting the site. You're looking at the alleged defect. Because those weren't perishable items. I mean, you did it. We don't have to focus necessarily on the product, but just the operations. The farm for the specific lot where it was grown and harvested, all those issues. We didn't have that opportunity back in 2016, 2017 to do that. And just real briefly with regard to the- I have a question based on what you just said. At some point when you heard that there were lawsuits flying around in the atmosphere regarding cilantro, you may not have had notice. There may be some discussion about whether you had knowledge, but would not that trigger then an investigation into your facility to make sure it wasn't you? Not by us, but- By the farm. We retained numerous experts, consultants. As soon as- You didn't wait for a piece of paper to make those kind of- take those kind of steps. Once we got involved in the lawsuit, we did. Obviously, we defended our client, which involved retaining consultants, experts. But, again, there was no- The farm that time. Yeah. The farm in 2016, 2017, all of that was foreclosed. With regard to the latent defect issue, just real briefly on that, there are cases, reported cases, multiple cases that talk about latent defects, and I think that's the reason why you have the reasonable notice requirement. Once a buyer is apprised of a latent defect, they have to give notice with invisible time. So I don't understand that latent defect exception, because it's really, I think, addressed with reasonable notice requirement. It changes when the notice has to be given. It seems like a potentially very broad exception. I agree. And then with regard to this food exception that you want us to have talked about, as you mentioned, there's no relevant case on that issue. He's essentially asking to rewrite the UCC. And the UCC really, I mean, it's a sale of goods, right? So the UCC covers the sale of goods. And food is a good under the UCC. Look at the definition under 2105 of the UCC. It specifically states that goods are all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale, other than the money in which the price is to be paid, investment securities, and things in action. Goods also includes the unborn young of animals and growing crops and other identified things attached to real estate as described in the section. Well, I think that it seems to be a request that we tell the legislature that the legislation that they drafted doesn't meet the need that they're trying to meet. And I'm not at all sure that's what we want. Okay. But I would say there's a little bit of that problem with your argument as well, because you're saying, well, if we didn't have notice like that day, you know, we couldn't do our investigation. A reasonable notice is going to depend on, you know, what we tell you we need. I mean, how do we know what reasonable notice or a time for reasonable knowledge is? How are we supposed to measure that? Yeah, and I just keep coming back to, if you look at the 607-38, it requires notice. Correct notice, pre-suit notice. Well, this was pre-suit. There's no question this is pre-suit. This was four years pre-suit, six years pre-suit. If it came in 2018 and they didn't sue you on this until 2022, which is the other thing I want to talk to you about, that's four years.  Right. Knowledge. Knowledge. Knowledge. Yeah, under your definition, I understand. Yes, so, yeah, that is pre-suit. So what's reasonable pre-suit? Well, how much, how far, how soon do you need to have knowledge for it to satisfy the notice report? Well, I think it comes down to the fact that, yeah, if you look at the purpose of the important notice requirements, we've been prejudiced. We've been deprived of the right to defend ourselves adequately, because the evidence is no longer available. So in terms of the date, I think in July of 2016, August of 2016, we should have been notified in some fashion, whether that's through Martin's pre-suit notice under the requirements or through actual knowledge from some other source. That never happened. Can you, unless your partner is going to address the, when this warranty claim was first asserted against you? Yeah, I can just briefly say it was in July of 2022. Okay. So to your question before, we were brought in, Martin brought us in on a third-party contribution claim that was dismissed under the Economic Loss Doctrine because it was alleged towards tort claims. So that was dismissed, and then you got to leave to file a breach of warranty claim. And then we got sort of jumped in on that. So that was in July of 2022 when that was first filed. Okay. Let's go with that one. Thank you. Thank you. This is the Court. Tom Wolfe from Lewis versus Boyd. And we have a lot of our programs. Your Honors, I just want to kind of narrow us back down to what really the issue is before the Court with a lot of factual discussion. But really, you're being asked a few minutes of the questions. Can Martin Produce satisfy the UCC notice requirement by relying on lawsuits filed by other persons? We've done exhaustive research on this issue under Illinois law, and there quite literally is no case that says that's allowable. There's no case that says it's not allowable, either. Well, we'll get to that. But I think you will find at the end of this that it's true. I mean, there are cases that say you cannot give notice to a suit except a PI suit, and it has to be your own PI suit. There are those cases. But those cases do not say that lawsuits that cannot be your notice still could be their knowledge. There's no cases that I've found. Right, right. So the law is essentially the buyer has to give direct notice to the seller. And this comes pretty soon. In other words, you're barred from any remedy unless you can rely on one of the exceptions, right? There's two exceptions. The second exception doesn't apply to Martin. Their emergency buyer didn't suffer personal injuries. So the only exception they can rely on is the first exception, actual notice. Actual knowledge. Actual knowledge, right? So the Supreme Court interpreted what actual knowledge meant by providing these examples. It does not include allegations of a lawsuit, right? If you were to take these allegations, pull it out of the lawsuit, just put it on a piece of paper, and you hand it to the seller, that's what direct notice looks like, right? Direct notice is not actual knowledge of the defect, though. If it was, you wouldn't have the actual knowledge exception in the first place, meaning it's signifying that it's different than direct notice and it's different than allegations of a lawsuit. And the Supreme Court's examples of what actual notice looked like is literally the seller of the defective product observing the defect, right? The Malawi case, the hospital who put in this medical device literally takes it out in its broken form. That's what they ruled was actual notice, right? Actual knowledge, excuse me. The Kress container case, an employee of the defendant literally goes and looks at this cooling system and sees leaking coils. They have actual knowledge of the defect. The Howard case was the defective vehicle literally being brought back to the defendant. Run the vehicle, and you can see and hear the defect. That's what actual knowledge is. And that does not occur through reading allegations of a lawsuit, which are not facts. It's nothing until it's proven, right? So that's how the Supreme Court has interpreted what actual knowledge is, right? So we know in this case Martin never provided direct notice. But amid that, the only knowledge we would have gotten would have been through allegations of a lawsuit. And it does not equal actual knowledge. And that's how the Supreme Court has interpreted that. If they didn't, if you say that my interpretation of Connick is incorrect, I would ask you to answer this question. Why did they specifically cite to those three cases where actual knowledge was achieved by literally observing the defect? That's what Martin had to prove in this case. And they couldn't, right? Their allegation of their amended third-party complaint was that La Valera achieved actual notice of the defect because it was sued by personal injury plans. So they tried to mold both of the exceptions into one, which I did not take case. There's a reason they're separated, right? So how do you get around Counsel's argument that in the examples that you gave of observing the defect, there's something, something's broken, something's visible, something's wrong with the vehicle, equalized, not visible, not smellable, can't smell it, can't taste it, can't otherwise observe it. How do you get around that? You can test at the farm. You can test your water source, the plants themselves. The Department of Health was able to test the cilantro. That's what the actual notice would have looked like in this case. If Martin Produce, in July of 2016, shortly after the outbreak, had called and said, hey, we think there's a problem with your cilantro. We need to go investigate it. That would fulfill the direct notice requirement. But that could lead to actual notice as well. We perform this traceback analysis investigation on the farm and find out, one way or the other, whether there's E. coli present on that growing field. If there's a test that's run and it pops up positive for E. coli, then we're on actual notice that, yes, our product that we're selling to the public is contaminated. That's how it would have happened in this case. Maybe it's impossible that actual notice could have occurred. So you're kind of saying the knowledge exception can't apply to latent data because you can't see it. And if you can't see it, then it's not actual knowledge? Is that what you're saying? Well, for example, if we sold cilantro to Carbone, we did. We sold it to Martin. And they tested and said, hey, here's this test result we got back from your cilantro. And the test says it's contaminated with E. coli. That's your actual notice. But the tester just happened to send you a copy of what they also sent to Martin Produce. That's knowledge. So you're saying you could get knowledge from a third party, not notice, because knowledge can come from a third party. It can. But knowledge from a third party doesn't satisfy the direct notice requirement from buyer to seller. Arguably, it could be actual notice if the test result is accurate. But allegations of a lawsuit, not even from Martin, from somebody else, is not a lawsuit. You're saying a lawsuit, just by the nature of what you're looking for when you're talking about actual knowledge, a lawsuit is not going to do it because it's just allegations. Right. It's a version of direct notice. And the Supreme Court allows personal injury claimants to satisfy that notice requirement with the lawsuit itself. And that makes sense. You know, I know the purpose related between merchant buyers. But just look practically at a personal injury claimant. Right. A personal injury claimant could have never given my client direct notice because they didn't know who we are. So the Supreme Court, in its wisdom, recognized, yeah, we're going to have a lot of people having personal injury lawsuits barred because they didn't provide pre-suit direct notice to a second-tier supplier who they had no way of knowing without first filing the lawsuit and then going for discovery. That can't be the reason because they don't have a recent warranty claim against you because you don't have your privity with you. So that can't be the reason. I don't think that's the reason. Well, I think it is one of the reasons. I mean, I think – I don't know what the reason is and I don't think it necessarily applies here because this was not a personal injury suit by them. So the request – What do you say – do you say anything about this delay between 2016 and 2018? Do you have anything to add on that? I do, yes. And so this is the whole underlying policy of the notice requirement in the first place. The biggest part of that is allowing the seller to investigate the potential defect by waiting over two years to sue my client. They weren't brought into this case until spring of 2018. That was impossible. We could never have investigated to see if we had any coli contamination at our farm because we're dealing with perishable food items. They're grown, harvested, and sold. In the United States, we use crop rotation. The field that has cilantro in 2016 has soybean or corn the next year to keep those fields – keep producing large harvests. But by not providing us the notice, you've taken that right to investigate completely away. And that undercuts the entire purpose of the notice to begin with. What Martin's asking you is to essentially excuse that because we defended ourselves in a lawsuit for several years, and I don't know what the alternative would be there to not defend it and take default judgments. I mean, that's what I guess the alternative would be so that we could come up here and say, well, we didn't even participate in those lawsuits, so we don't have any knowledge at all of what's going on. Instead, you can't villainize the defense of the case to try to jam through this notice argument as they are. And what they've asked you today, first of all, is to create a new exception. So the Supreme Court has ruled on what the exceptions are to UCC notice. As the trial court recognized, they can't agree to Martin's argument because it would create a third exception. And when the Supreme Court rules on an issue, the lower courts are duty-bound to follow it. The trial court was duty-bound to follow that, and respectively, so is this court. You can't create a new exception to these two exceptions that already exist that the Supreme Court in Connick has acknowledged. That asked today is not lawful. So this worry about the latent defect that they discussed is unfounded. Just reading the statute shows you that, of course, the UCC can apply latent defects because the law literally states that a buyer must, within a reasonable time after he discovers any breach, notify the seller or be barred from any revenue. They unquestionably had knowledge of an E. coli offering related to cilantro in July of 2016. At that point, the notice requirement kicked in, and they breached it by never providing my client any notice at any point in time in this case. So there's no need to even carve out, even if you could do that, a latent defect exception or a perishable food item exception. We know E. coli existed because people got sick. And so at that point, when you know there's an E. coli offering, that's when you just have to, within a reasonable time, provide a notice. And you asked earlier, Mr. Fairleese, if we had raised this timeliness issue. There was an argument that we raised. The lower court denied it. But in the motion to reconsider, we only focused on whether notice was given at all. And the trial court recognized that they conflated reasonable notice with direct notice, and that was the error where they effectively created a third exception, which they could not do. Judge Kubasik recognized that and reversed himself. I'm going to suggest to you so you can respond to it, that the trial court confused the two conic exceptions and said, because a P.I. suit cannot give notice from somebody who's not the plaintiff in the P.I. suit, therefore the P.I. suit can't be acknowledged. And that seems that he conflated the two conic exceptions. Right, it can't? Because it can't. I mean, there is no case that I'm aware of that you cited that says that a suit from somebody else can't be the basis for notice. You're asking us to find that to be true, and that's not in the Supreme Court's decision. Right, but look at the rationale that lawsuits don't provide actual notice. I mean, if it did, everybody would be able to satisfy the notice requirement by filing a lawsuit. Well, the knowledge you need to have is that there's a problem with this product. A lawsuit is a pretty good indication that there's a problem with this product. That's what lawsuits are about. There's a problem. You may have a solution to the problem. The problem may be in the plaintiff's mind, but there's a problem. Right, and I think we've discussed that. I mean, the lawsuit and exception and direct notice are really one and the same in terms of the information that's provided, right? The allegations are just, we think your cilantro was contaminated and you caused us an injury. Well, that's what direct notice looks like from Martin Jobs. Hey, your cilantro was contaminated and a bunch of people got sick, right? Yet, still exists an actual knowledge exception showing that it's different, right? And the Supreme Court specifically provided examples of what actual knowledge looks like, and that's the exception that Martin has to rely on. Their allegation in the third-party complaint is that we had actual knowledge because we were sued, and the Supreme Court went out of its way to make sure that only personally complainants can satisfy the notice requirement with a filing of a lawsuit. But, importantly, there still exists an actual knowledge exception. If notice from third parties filing a lawsuit qualified as actual notice, you would only have one exception, and the Supreme Court would just interpret it as actual knowledge means observing the defect or being sued by personally complainants. It doesn't exist a second exception. I think that gives a clear indication that it's different. It doesn't rise to the level of actual knowledge. In the case that it's cited, with any comment, support my position. Thank you. Personal injury lawsuits satisfy the actual knowledge exception of CONIC because personal injury consumers do not have privity contractual relationships with the sellers. What counsel is suggesting does not make any sense. Obviously, Martin Protus didn't get sick and sue them. Personal injury complaints satisfy actual knowledge because you've got to figure out who's at fault, which creates knowledge, satisfies notice. And that's how that works. Stand in the place of knowledge instead of notice. Excuses for failure to give notice. Yeah, they use the word fulfill. They use the word fulfill. We didn't cite the three cases of actual knowledge, but in those instances, yes, you take out a bone plate, it's broken. You look at a coil, it's too small. You have a car, it's broken down seven times. Employees tease you. That's true. But following their argument, in any food-borne case, they would have had to personally have ingested it. They would have had to have it tested, which it is not the custom and practice to ever, ever, ever test this stuff, just so you know. And otherwise, it's the verdict. And that's what's so worrisome, is that the only way that, as a matter of law, the fact finder comes back and says that the E. coli was tainted because they believe in epidemiological study. And they're not in the case, and we've got to give them notice. Suddenly, there is a breach, and there's a nonconformity, and we've got to do it all over again. One of these esteemed counsels said, what Martin's arguing is, like, here's what Martin would say. Do not let them hide behind a technicality, behind something after five years of lawsuits and settlements paid out and depositions and all that, so that they're not involved in a multimillion-dollar lawsuit brought by a restaurant against a distributor. And those that provided the goods at issue and had known about it for years, well, years in advance, before we filed the third-party complaint. What about this delay between 2016 and 2018? Thank you. That's my third no. It's not before you. It's not argued. The lower court didn't think about it. I don't know. I would say there's no delay. There's a question of fact, perhaps. Sure. It would be a question of fact. But here's what I do know, is that generally, unless the issue is raised by the lower court or in some appellate briefs, when I'm sitting there going, what are we talking about? That's not how it works. So, no, 2016. And I have to say that this is such a conundrum because it wasn't argued. It's not before you, but it really makes a lot of sense. We concur on these bases. I know. Absolutely. There's an old rule. There's an old rule, everyone. There's an old rule. Not abuse of discretion. Anyway, but the point is that... It's not before us. It's not. Okay, so timing is not before you. But here's the thing. Here's the thing. There could not have been timing. Here's the reality. The reality is that we were told that something bad happened at a restaurant, and we said, uh-oh. And when they came and tested our stuff, and they said, you're fine. You're good. And we asked our customers, and they said, you're all right. You're good. Of course we didn't call up our vendors. There was no reason to call up our vendors. But as soon as we got sued, we sent them subpoenas. As soon as we got sued, we're like, well, hold on, hold on, hold on. And when was that? That was, um, 17, 18, 20. They waited a little bit. You know why they waited? They waited because they wanted to settle their cases. They called us up. I mean, there's all this stuff now before you. But, I mean, the reality at first, this is why personal injury complaints satisfy the notice requirement. Because they called us, and they negotiated, and we called them, and they called them. They didn't check their fields. They did later. Of course they didn't, because there was nothing wrong with their stuff. There's still nothing wrong with their stuff. I know you don't like that. I like that. I like cilantro. I have cilantro, too. You should still like cilantro, because there was nothing wrong with it. How about that? How about that? But the thing is that, um, yeah, I mean, it's been tested. We're going to call them. I mean, the UCC provisions are literally to say, if you've got a box of widgets, and there's a thousand widgets, and someone's buying these awesome widgets, and they accept them, and they go, those look like great widgets, and they're sitting over here, and they're sitting on a shelf for, like, a month. And someone's used those widgets, and someone has designed them backwards, and they don't work. You can't file a lawsuit. The business transactions, this whole idea of, well, if you allow this, there'd be a million lawsuits. No, no, no. Personal injury lawsuits are going to be personal injury lawsuits. But in that instance, it's crystal clear. You call them up and go, you made the widgets wrong. No, I didn't. Hey, they can look at them. Okay. Yep, you're right. I'll send you some new widgets. You're a good customer. Or forget it. Sue me. But the fact is, that makes sense. That's what it's for. You're saying it doesn't fit well in this whole scenario. It doesn't fit at all. Thank you so much. But it doesn't allow us to get rid of it. Do you understand that? To get, I was... To get rid of the UCC. Oh, that's stupid. I mean, you are very powerful, but I don't think... I don't think... But there is one thing. I was sitting there listening to all this and I'm like, okay. Under Muellbauer, which is in the brief, it's a Northern District 2006 case. Notice under Section 2607 is not intended to establish a strict, non-practical requirement. It defeats its own purpose and prejudices claims. That's my beer. Thank you very much. Thank you. Thank you all very much. We will take the matter under advisement. Thank you. Thank you. Now, I believe that you can stay. Nobody asked you. We can stop the recording now. Yeah, please stop the recording. Somebody is going to need us in a few... Thank you. Do you all have it? Yeah, on day two. The second day of Monday. So, I believe we earlier had our dean here. I think she had to slip out. She was going to get some words and thanks for the course and for everyone participating. So, maybe she'll pop back in at some point in the next half hour. But we are going to open the court to questions and to the parties as well. We can't talk about the specific case, obviously. But you have some experts here in college advocacy. We have students from their first, second, and third year. Some who are in the court. Some who are about to try out for the court actually this afternoon. So, if there are any questions that you guys have, keep that in mind. But maybe we can do a little rundown of everyone's background, I guess. We can start with you. Well, some of you guys know me. My name is Samantha Carranza-Gramasekera. I am a double dean and graduate. I went to undergrad to Poli Sci here and then graduated from law school in 2017. Currently, I'm in a public court law clerk for Justice Cobbs who's not on the panel. But I think she knows you all very well for the most part. And then I supervise and coach some of our 2L and 3L students in the moot court program. Some who are over here as well who have come to see. They just all wrapped up their competition. So, they've got that under their belt. I'm sure they've observed some moot court tactics as well. They're going to be oral arguments as well. And I am an admitted appellate court nerd. So, it's very fun for me to observe this. So, thank you so much for accommodating us and being here as well. How we came to be here other than... I just think sometimes judges are a mystery to students. They're a mystery to judges. I am for joining a law. I came out many, many years ago. Practiced law. Then I went to the city council. I had the misfortune of coming out of the city of Chicago. It was really a wonderful experience. And then I came to the convention in 2011. Stayed on the circuit court until December of 2022. So, Mary is the theme of justice in terms of longevity at this level. John Marshall Ross will graduate. The former John Marshall Ross is now known as U.S.B. Ross. I'm Mary McClough. And I graduated from Northwestern, which is not called Northwestern anymore either. But, I get to the Pritzker School of Law and Debt. And I became a trial court judge in 2004 and joined the appellate court in 2016. Hi, my name is David Navarro. I came on the bench in 2017. Graduated from the University of Iowa College of Law. And I came to the appellate court in 2023. Maybe the lawyers can just briefly tell us who you are. Who are you really? So, I am proud to say that 30 years ago this month, I graduated from this establishment. And I did moot court, by the way. And do not do what I did. Moot court was awesome. I definitely recommend the competition. We had Cincinnati and all these different places. Don't walk around like I did. I don't know, I got out of control. So, yeah, I graduated in 1994. I've been doing litigation for 30 years now. I have my own law firm. And I've known these guys for a long time. I'm the guy who did research. He did all the work. He's the guy that did everything. Hi, I'm Nick Paralisi. I'm a partner with the downtown firm of the Shield Cabo. I also graduated from DePaul Law School back in 1989. So, great fine establishment. I agree. So, I've been practicing since 89 in insurance defense, commercial litigation for my entire career. And I've been here to argue in court on occasion with certain cases. But most of my time is probably spent with the trial courts. Arguing motions and sitting up here at the trials and attending trials. My name is Phil Litchfield. I'm Nick's partner. I've been working on this case with Nick since Jack Tuckson was served six years ago now, I guess. So, this one's a baby of mine. It's probably the oldest case that I have. Graduated in Chicago, Kent, 10 years ago. But I started on the plaintiff's side. Shifted to the defense side. And, again, my practice is pretty similar. Tom Wolfe. I graduated from across the street from here. Judge Weill. Not together, but... Same building. Yeah, same building. It was actually Phil John Marshall back then as well. I work for a downtown firm called Lewis Bruce Boyd. Where I said across the street from Kent Law School. And I handle... It's all insurance defense, but it's a wide variety of different types of cases. Very rarely get to the appellate court. But with a case like this, and how old it is, you would expect at some point it would be at this level. And I've had... I fathered a child since then. Not one. So, it is the longest case. It's the oldest case I've had, for sure. But the light at the end of the tunnel is dumbing itself. Any burning questions from the audience? We're happy to answer any questions about appellate practice or the practice of the court. Just not this case, obviously. But, any questions? We were at high school yesterday, and they had lots of questions. Like, why are we even here? No one wants to know. Why are we here? We're on the road here. You guys should know. Yeah. There's a paper front, and there's a word requirement. You can exceed the page requirement if you meet the word requirement. So, it's very rule-based. And so, read the rules, and be very comfortable with the rules before doing anything in the appellate court. That would be my recommendation. And from time to time, people file motions to file oversized briefs. And we generally grant them, but we don't like those briefs. We try to get as many insights as possible. Those are the questions. When you see a brief, do you have a knee-jerk reaction when you see a 30-page brief versus a 10-page brief? Or is it really case-specific? It's pretty case-specific. I will say, in criminal cases, maybe a little bit more, because it's always OSED and the state's attorney's office. So, if OSED files a 10-page brief, that might say something to me. But from law firms, I mean, different law firms, I think a different style. You know, I don't generally. And some cases are really one simple legal issue. I think I agree with what you all said. I think we all do. As concise as you can make your arguments, but don't, you know, but do make your arguments. And start with your strongest, generally, because we all tend to wane. And there are some that you read, and they're just repeating and repeating and repeating. We've got it the first time. My question is also about briefs. How much weight do you give a brief versus a very well-spoken and well-articulated oral argument? And I guess a sub-question is, can a rebuttal face a poorly-given oral argument? Well, I don't know that a rebuttal is going to save an argument, but it's all taken together. And I think that when we have oral arguments, there's usually an issue that we're, that we've been discussing. Issue or issues that we've been discussing. And oral arguments can help hone that or focus us so that we can better hopefully come to some agreement within ourselves. Is Dean here? Yeah. I saw her speak. Yeah. Did you want to say a few words? Absolutely. I don't want to interrupt anyone. I feel like I'm coming to a party. So can I come to the podium real quick? Thank you. Look at this wonderful room. Thank you for all that you've done. I just want to, I'm a good advocate. I was prepared to welcome you. Now I'm going to say goodbye and goodnight. But I just want to take this opportunity to thank everybody for coming and being part of this. It's such an important educational experience for our students and for the community. So I want to thank the judges, particularly Justice Mikva, for making this happen and making sure that we were able to do this all here. Dodie Marcucci, who in the spirit of DePaul, said that sounds like a good idea and made everything happen. And of course all the clerks and the staff and all, and the lawyers for doing this with an audience, which I don't think you ordinarily do. So really, really appreciate that. And I just hope the students in the room that you really got a sense of what lawyering is like. Oral advocacy is a really important part of lawyering. Whatever field that you go into, whether you're a transactional lawyer, whether you're an education policy, whatever it is, being an effective oral advocate and an effective persuader is so important. And I hope that you were able to see with the lawyers here that it's a skill. It's a skill that you hone. It's a skill that you practice over and over. It's a skill that you watch. So if you see effective arguments, you can begin to model what good argumentation is or what the strategy is for what the judges are asking about. But the last thing I want to say is it's also about confidence and professionalism. And so everything, the manner, the civility, the professionalism that you show to the judges, the justices, as well as to the staff, is really important. As well as just what you choose, what law you choose, how you respond to questions, what facts you select. All of that is part of being a wonderful and effective lawyer. So I'm so glad that you had a chance to experience that today. And I'm really glad that you came and made a real life experience for our students. So thank you very much. Thank you. Thank you for having us. And just following up on that, I do want to say this is really excellent advocacy all the way around. These are really experienced lawyers. We kind of chose this case for you because we knew that they would be. And they certainly didn't disappoint. And, you know, you can go back and think and process what they did that you appreciated. But one thing is, as the dean said, they sort of went with us rather than sticking necessarily with everything that they came in wanting to say. And they've been doing it a while. I just wanted to mention to everyone what the dean just said, which is professionalism. I don't know if you noticed, but, like, I would never attack them. They would not attack me. There's no personal aspect of any of this ever. I mean, trust me, like, they won, I lost, da-da-da-da. It's hard. The reality is it's hard. But you would never attack your opponents. Don't ever do that. The other thing that's extremely important, do not be super critical. There's certain words you can use. I'm basically saying the judge made a mistake, right? There's this good judge. There's nothing personal about what that judge did. There's an error. That's why they're here. They can look at it and say, yep, that was a mistake. But be very careful not to be too critical. Do not make it personal. Do not use inflammatory language when you're saying that the order entered was bad, even if it's, like, how bad it hurt your client or any of that stuff. Don't get into that. That's not what's in front of them. One of the questions that they asked us at the high school was which one of the TV programs was more reflective of the real law. So, don't watch any of that. I've not seen anybody admit to a murder. You're not the appellate court. Yeah. So, maybe in law school, you know, the students, they'll try out the mock trial and they'll try out the moot court. So, they kind of, you know, diverge into those specific, I guess, areas in law school. But it seems that most of everyone here has both trial and appellate experience. So, I guess, in your experience, is there a path that a student needs to take to get to arguing in front of an appellate court? Or is it really practically more of a mix of both at the same time? I think it's probably a mix of both. I mean, if you're practicing in a trial court, you're going to end up on appeal, just like what happened in this case. So, summary judgment was granted. Appeal was taken.  We can argue the issues. So, just by being involved in cases at the trial court level, you're naturally going to end up probably in the appellate court addressing various issues. I always tell my associates that if you learn how to lead, you can kind of do everything else. So, if you learn how to make arguments and you understand evidence and foundations and those basic things, it'll translate to contract work. It'll translate to appellate work. And so, you can take a path of an appellate lawyer, but you're going to get more experience arguing and putting together your evidence and things if you kind of go the litigation route. I would even suggest a year or two of litigation, just to get it under your belt, so you understand what that foundation is. And then, you know, go into your professional career. There's a question in the back there. Mark? Yes. From being a professional attorney to then being a trial court judge and then being a trial court judge on the appellate court, what are the things that you did to prepare yourself for each stage of that? I think right off the bat, if you want to be a trial attorney, you have to try and get into an area where you can do that. There's different areas of law that are going to expose you to trials earlier than other areas. I was at the state attorney's office as a younger attorney. And so, I had an opportunity very early on to try cases. That's an example of a place where you can get that. And that trial experience then helped me as a circuit judge and later as a peer, hopefully. I mean, if you look at the three of us, we took very different routes here. Completely different. Dave's whole experience has been in the criminal courts as a lawyer, then as a judge. I changed jobs every four years just because I have a very short attention span. Justice Lyle came up, as she said, through city council. You know, I started at small law school. Right, before that. And so, you were the last one in the door. And they would say, okay, now you're going to court. And so, that's how I got trial work. And one of the things that I noticed real quick, as an aside, is when I went to the bench, it was amazing to me. I have different seats in different divisions. And there were lawyers who, when you say, let's set up a trial, they would start crying. So, trial work. Got to get it. If you have to ask someone, can you second chair them? And if you want to do this, because I had a partner in one of the firms who would get nervous if you asked him to get a continuance, because he never wanted to do any trial work, and all he did was bonds and transactions. So, again, it's where you see yourself and what you think you want to do. Do what you want to do. That's the key. Do what you want to do. Do what gives you joy as a lawyer. And do it well. From where you three sit on the bench, what is the key difference in what your role and what you're looking for between trial, judging a trial and the appellate level? What are the key differences from your perspective and what you're looking for when judging between trial work and appellate work? In trials, you're looking at resolving a dispute between people. And people are in front of you, and they come to court, and they bring their families. At the appellate level, we're looking at the lawyer. But I think we're also looking at the appellate level, and it took me a while to get to recommend this, but we're also looking about shaping the law. So, and I don't want to be specific about this case, but on both sides, they're saying, well, here's how we view this rule, and here's how we view this rule. And we have to decide this case, but we also want to think about, because it is binding, at least on the trial courts in Cook County until somebody else says something different, you know, what should be the rule? What is the right rule? And that's not really anything the trial court thinks about. They think about what's the right result. Here. Because the appellate court has such an important role in shaping the law, how do you, as a justice, continue to learn and grow in this career, because it's a very long career, unlike, you know, working at a firm? So how do you kind of check yourself or grow in this field? This is new to me, so I'm learning all the time. I've got great law clerks, a couple who are here, and so I'm learning from them, with them. All the time we go to educational conferences, and that's a good place to talk to other judges and learn from them. When my kids were younger, we were working on some homework, torturizing homework, and I said, I can't wait until I'm done with school so I can stop learning. And that'd be nice, but I don't think you don't. You're always learning. You are always learning. In an educated society, each of us is supposed to be a continuous lifelong learner. I mean, that's what we say, and unfortunately we have to practice that, because you guys are constantly sending us new things with new areas of the law. So we have to, if you're in a trial court, maybe your court, that's your work, in that room. Because the computers are working with us when you wake up in the morning, when you're on the beach, and you just have to constantly keep up with the lawyers that are constantly giving us more work to do. Yeah, I think the same applies in the private practices. You know, you can handle all types of cases. So, school-gone-illness cases, private liability cases, construction cases. You're always learning. And I enjoy that, that's what it's been for my career. I enjoy that, to learn new stuff. And it's shocking to me. I've been on the bench 20 years. I still look at a case and I go, I've never heard of this statute. I didn't have a statute. Why? So, and the Illinois court system, I have to say, is very committed, and Justice Lyle particularly is very committed, to the education of judges on the Illinois courts, and the entire court staff. And that's, again, part of what makes it fun. When we were practicing, we had CODs, like all these. And the judges, and we train our own attorneys, our own judges, and we encourage them to keep training anybody. I think we've got a minute or two left. Does anybody have any questions? I have one more question. So, my question is, I'm thinking of maybe pursuing a career as a judge one day. Do you have any advice for me before, you know, pursuing a career after law school on what the best route is, or do you kind of just fall in place sometimes? I don't know about falling in place. There are some people who came in through agencies, because that's where you get a lot of trial work. And you also get known in the area of the law, because many of the people you work with at an agency, maybe they have gone on to become judges, and so maybe they can give you some tools and things to do. A lot of involvement with bar associations, because eventually the bar associations, you look to them for ratings when you decide that you want to make that move. And I didn't, well, yeah, I was involved in bar associations, but I also was involved in, like, committee work with the Supreme Court. We're looking for lawyers who wouldn't say no. They'd call you and say, oh, I should be on this committee, and character fitness and some other things. So that's how you're becoming known in the community if someone may recommend you for an appointment. That's just one way. Just be a good lawyer. Practice being a good lawyer before you become a judge. It's a great job. It's the most wonderful job in the world. But I don't think there's any one route to get there, and there's no sure route to get there. It is as much fun as it looks. I want to thank Dean Rosado. Dean John, thank you very much for allowing us to come here. It's a lot of fun. And thank you again to the lawyers. And you'll hear from us in due course. Do you say all right? Do I say all right? You're taking your time. I know. The only thing I want to say, if you ever do this again, whoever is putting the room together, remind them that all the judges are not six feet tall. All right. Thank you. Thank you. I hope so as well. That would be great. Thank you.